UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:17-CV-00056-BR

| | |
|---|---|
| FREDRICK E. SMITH and BETH SMITH, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>RELIANCE STANDARD LIFE INSURANCE )<br>COMPANY, )<br>)<br>Defendant. ) | ORDER |

This matter is before the court on Reliance Standard Life Insurance Company's ("defendant") and Beth Smith and Fredrick Smith's ("plaintiffs") cross-motion for summary judgment. (DE ## 25, 27.) Both parties filed responses in opposition. (DE ## 33, 34.)

## I.     BACKGROUND

This action arises over a dispute regarding Fredrick Smith's long-term disability benefits earned on behalf of his employment with Charles Craft. Inc., ("Charles Craft") in North Carolina. On 5 January 2017, plaintiffs filed this action in North Carolina state court, alleging state law claims arising out of defendant's denial of long-term disability benefits for Frederick Smith and waiver of life insurance policy premiums for the benefit of Beth Smith. On 31 January 2017, this action was removed by defendant to this district, and defendant filed its initial motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Defendant contended that plaintiffs' state law claims were preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* On 9 February 2017, plaintiffs filed an amended complaint, adding an additional claim against defendant for violations of ERISA. On 1 March

2017, defendant filed its second motion to dismiss under Rule 12(b)(6). Defendant contended that plaintiffs also failed to state a claim under ERISA. On 3 May 2017, the court denied defendant's initial motion to dismiss as moot and denied defendant's second motion to dismiss on the merits. The court deemed plaintiffs' state law claims to be brought under ERISA.

Thereafter, both sides moved for summary judgment. On 1 September 2017, defendant filed the instant motion for summary judgment contending that there is no material fact to show that it abused its discretion in denying plaintiffs' benefits under ERISA. Defendant contends plaintiffs failed to prove Fredrick Smith was incapable of working in any capacity after 15 June 2016, and he possessed the education, training, and experience required to work in another occupation. On 2 September 2017, plaintiffs filed the instant motion for summary judgment. Plaintiffs also contend there is no issue of material fact on whether defendant abused its discretion in denying plaintiffs' benefits. Plaintiffs contend it presented evidence of Fredrick Smith's disability under the long term disability policy ("Disability Policy") and that defendant's determination to deny benefits was not supported by substantial evidence. Plaintiffs request the reinstatement of monthly long-term benefits under the Disability Policy, the waiver of premiums and provisions under Fredrick Smith's two life insurance policies ("Life Policies"), and back payments from previously denied benefits.

The undisputed facts are as follows. Defendant issued the Disability Policy to Charles Craft on 1 July 2004, which it amended on 17 May 2011 (Policy Number LTD 111018). (Admin. Rec. (DE # 30) at 1.) As a Charles Craft employee, Fredrick Smith was eligible for coverage under the Disability Policy. (Admin. Rec. (DE # 30-17) at 29.) Fredrick Smith's health declined in March 2013. Following a "cardiac catheterization which revealed multivessel coronary artery disease. On [6 March 2013], Dr. Ali Husain ["Husain"] performed triple

2

coronary bypass graft surgery with the left internal mammary artery to left anterior descending artery, reverse saphenous vein graft from the aorta to the ramus intermedius, and reverse saphenous vein graft from the aorta to the obtuse marginal artery." (Admin. Rec. (DE # 30-10) at 17.) Following the bypass surgery, on 30 July 2013, Fredrick Smith submitted a claim for benefits under the Disability Policy. (Admin. Rec. (DE # 30-17) at 33.) In his claim, Fredrick Smith indicated that he was unable to work full-time as of 4 March 2013, and unable to work part time as of 24 July 2013. (Id.)

Under the Disability Policy, if the insured qualifies as "totally disabled," then he or she receives a monthly benefit. (Admin. Rec. (DE # 30) at 18.) To receive the monthly benefit, the insured must be under the regular care of a physician (exception permitting), have completed the elimination period, and submit satisfactory proof of total disability. (Id.)

> Totally Disabled and Total Disability mean, that as a result of an Injury or Sickness:
> (1) during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation;
> (a) Partially Disabled and Partial Disability mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period;
> (b) Residual Disability means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability….

(Id. at 10) (internal quotations omitted).) Fredrick Smith was approved by defendant as totally disabled under the Disability Plan to receive benefits for 24 months. (Admin. Rec. (DE # 30-8) at 2.) After 24 months, however, the definition for total disability under the Disability Policy changes:

3

> Totally Disabled and Total Disability mean, that as a result of an Injury or Sickness….
>> (2) after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a full-time basis.

(Admin. Rec. (DE # 30) at 10.) Under this definition, defendant determined Fredrick Smith did not meet the definition of totally disabled as of 16 June 2016. (Admin. Rec. (DE #30-10) at 22.) Fredrick Smith appealed the decision, providing further documentation of his medical history up to that date, which defendant denied on 1 September 2016. (Id. at 16.) Fredrick Smith then filed a reconsideration of the denial, which defendant refused to review, citing the determination on 1 September 2016 as final. (Id. at 25.) Thereafter, Fredrick Smith did not receive benefits under the Disability Policy. (Admin. Rec. (DE # 30) at 22.)

Fredrick Smith also has Life Policies with defendant (Policy Number GL 135467). (Admin. Rec. (DE # 31-19) at 1.) Beth Smith, his wife, is the sole beneficiary of the Life Policies. (Admin. Rec. (DE # 31-20) at 18-19.) Under the Life Policies, if a person qualifies as totally disabled, they receive a waiver of premium payments. (Admin. Rec. (DE # 31-19) at 20.) Under the Life Policies,

> Total Disability, as used in the WAIVER OF PREMIUM IN EVENT OF TOTAL DISABILITY section, means an Insured's complete inability to engage in any type of work for wage or profit for which he/she is suited by education, training or experience.

(Id. at 10.) After defendant determined Fredrick Smith did not meet the definition of totally disabled under the Disability Policy, it determined he did not meet the definition of disabled

4

under the Life Policies because he was capable of full-time sedentary work. (Admin. Rec. (DE # 30-10) at 19.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the record as a whole reveals no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

## III. DISCUSSION

In determining whether a plan administrator abused its discretion, the court considers a number of non-exclusive factors, including:

> (1) the plan language; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions of the plan and earlier interpretations of the plan; (5) whether the decision-making process was reasonable and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

5

Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 359 (4th Cir. 2008) (citing Booth v. Wal–Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335 (4th Cir.2000)); see Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008) (finding that a conflict of interest arises under ERISA when the plan administrator determines the insured's benefits eligibility and pays the insured's benefits). The court reviews the administrator's determinations, using these factors, for an abuse of discretion. See Donovan v. Eaton Corp., Long Term Disability Plan, 462 F.3d 321, 326 (4th Cir. 2006). This standard is deferential to the administrator, and therefore, a court will only disturb the administrator's decision if it is "unreasonable." Piepenhagen v. Old Dominion Freight Line, Inc., 395 F. App'x 950, 954–55 (4th Cir. 2010).

"A reasonable decision is one where the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Piepenhagen, 395 F. App'x 950, 954–55 (4th Cir. 2010) (internal quotations and citations omitted). Under the abuse of discretion standard, the "assessment of the reasonableness of the administrator's decision must be based on the facts known to it at the time." Elliott v. Sara Lee Corp., 190 F.3d 601, 608 (4th Cir. 1999) (internal quotations and citation omitted). An administrator cannot "arbitrarily refuse to credit a claimant's reliable evidence, such as the opinion of a treating physician." See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003); Williams v. Metro. Life Ins. Co., 609 F.3d 622, 634 (4th Cir. 2010) (finding that ignoring a treating physician's conclusions that plaintiff had hand and wrist pain, which would affect her ability to type throughout the day, as unreasonable when there was only a "scintilla of evidence" to the contrary). An administrator cannot reach a decision by misreading evidence, or taking bits of evidence out of context. Myers v. Hercules, Inc., 253 F.3d 761, 768 (4th Cir. 2001). An administrator must read evidence reasonably. Id.

6

Here, the issue is whether defendant's denial of benefits under the definition of totally disabled under the Disability Policy after 24 months was reasonable. In making its determination, defendant relied upon two sources: (1) a report by an independent physician, Dr. Patrick Weston ("Dr. Weston"), and (2): its own interpretation of Fredrick Smith's medical records. The court analyzes this evidence below to determine if defendant's decision was a result of a deliberate, principled reasoning process and supported by substantial evidence, or if its decision was unreasonable and an abuse of discretion.

1.  Dr. Weston's Report

Dr. Weston concluded Fredrick Smith was able to perform sedentary work on a full-time basis. In making his determination, Dr. Weston relied upon Dr. Thor Klang's ("Dr. Klang") medical notes, which according to Dr. Weston, stated that Fredrick Smith could: (1) walk 7-8 miles at a time; (2) hunt on a weekly basis; and (3) demonstrate 4/5 out of 5/5 muscle strength in both his upper and lower extremities. (Admin. Rec. (DE # 30-15) at 16.) Additionally, Dr. Weston relied on a normal echocardiogram dated June 2016. (Id.) Dr. Weston made his determination without the benefit of speaking with any of Fredrick Smith's treating physicians, including Dr. Klang. (Id. at 11-12, 14-15.) Rather, Dr. Weston reviewed only the medical history presented on paper in the Administrative Record. (Id.)

Dr. Klang's 22 January 2016 medical notes, on which Dr. Klang relied, state:

> His remained active including hunting he is previously going on about 50-1/2 mild tracks but did tend to leave him sore lower extremity so he is Back but he can do 7 a half miles without problem. [sic]

(Admin. Rec. (DE # 30-12) at 21.) In the same report, Dr. Klang wrote,

> He also describes some substernal chest discomfort with vibration or palpitation feeling lasts about 10 seconds have been on and off for a few days but seems to be

7

> better over last couple days has some chest discomfort not associated with other symptoms just at rest usually also lasting a short period resolving does not really bother him but because of his heart history he was concerned however he is able to walk 8 miles without discomfort and hunt without difficulty.

(Id.) Dr. Klang further noted that Fredrick Smith is "able to walk a mile." (Id. at 25.) Dr. Weston relied upon all of this information in his analysis, without questioning the accuracy of the information or accounting for the conflict in the information as presented. He further assumed that the medical notes referred to Fredrick Smith's abilities "at a time" and not weekly, monthly, or some other increment of time. Dr. Weston made this determination of degree despite the fact that another medical provider in the Administrative Record, Dr. B. May DePaola ("Dr. DePaola"), wrote in her medical notes on 13 April 2015, that Fredrick Smith is "walking up to 40 miles *per week*." (See Admin. Rec. (DE # 30-12) at 2) (emphasis added).) Dr. Weston also did not provide any explanation for the differences in Fredrick Smith's reported ability to ambulate from 13 April 2015, when Fredrick Smith met the qualifications of the Disability Policy, to 16 June 2016, when Dr. Weston determined Fredrick Smith did not meet the qualifications of the Disability Policy.

Dr. Weston also relied upon a portion of Dr. Klang's medical notes despite its obvious incoherent phrasing, such as "50-1/2 mild tracks," and "7 a half miles." (See Admin. Rec. (DE # 30-12) at 21.) Dr. Weston further overlooked a disclaimer present at the bottom of Dr. Klang's medical note submission, and included in all of his submissions, that "[t]his note was formulated using various recognition software and therefore may contain unintended errors." (Id. at 25.)

These facts are similar to those in the Fourth Circuit's opinion in White v. Eaton Corp. Short Term Disability Plan, 308 F. App'x 713, 717 (4th Cir. 2009). In White, the plaintiff was denied benefits by the administrator because his functional capacity evaluation ("FCE") stated he was able to meet the physical abilities of a machinist. Id. The opinions complied by the

independent medical reviewers relied heavily on the FCE.  Id. at 18.  However, the FCE also said plaintiff could not fulfill his job's walking requirements and noted other extreme physical limitations.  Id.  The Fourth Circuit court found the internal inconsistencies in the report particularly problematic.  Id.  The administrator did nothing to account for the inconsistencies in the reports.  Id.  As such, the Fourth Circuit found the administrator relied on a fundamentally flawed FCE and the administrator abused its discretion in denying the plaintiff's benefits.  Id. at 719.  Similarly, here, Dr. Weston relied on medical notes that provided inconsistent and incoherent information that Fredrick Smith could walk 7-8 miles at a time.

Further, on 16 October 2016, Fredrick Smith requested a reconsideration of the appeal denial and attempted to supplement the Administrative Record.  Part of his supplemental materials included a copy of a letter from Dr. Klang indicating that there was a mistake made involving his voice recognition software on the 22 January 2016 visit.  (Admin. Rec. (DE # 30-16) at 12.)  Instead of "can do 7 a half miles" the phrase should have been "can ambulate about a half mile," and Dr. Klang clarified that Fredrick Smith could walk 8 miles "a week."  (Id.)   That is consistent with how Dr. DePaola reported Fredrick Smith's ability to ambulate in terms of degree, and if her report is accurate, would indicate that his ability to walk had declined significantly from 13 April 2015 (when he saw Dr. DePaola) to 22 January 2016 (when he saw Dr. Klang).

In response to Dr. Klang's supplemented information, defendant indicated that its administrative determination on 1 September 2016 was final and that this information would not be considered part of the claim file because the Administrative Record was closed.  (Admin. Rec. (DE # 30-10) at 25.)  Defendant further asserts that such information is not admissible evidence before the court because it was not part of the Administrative Record when the ERISA

9

determination was made. However, the Fourth Circuit noted in Helton v. AT & T Inc., an ERISA case, that,

> a district court in many cases may not be able to adequately assess a number of the Booth factors in the absence of evidence from outside the administrative record. For example, the fourth factor requires a court to consider whether the coverage determination at issue is consistent with earlier interpretations of the plan. Because the administrative record focuses on the coverage determination at hand, courts would have to look at extrinsic evidence concerning the plan administrator's prior coverage determinations to assess this factor. See Gooden v. Provident Life & Acc. Ins. Co., 250 F.3d 329, 333 (5th Cir. 2001) (explaining extrinsic evidence is necessary to determine "how an administrator has interpreted terms of the plan in other instances" (quotation omitted)). Similarly, one can envision many circumstances in which a court would need to look to extrinsic evidence to evaluate the adequacy of the administrative record, as is required by the third factor, or the impact of a plan fiduciary's conflict of interest, as is required by the eighth factor. See Murphy v. Deloitte & Touche Group Ins. Plan, 619 F.3d 1151, 1158 (10th Cir. 2010) ("[W]ithout discovery, a claimant may not have access to the information necessary to establish the seriousness of the conflict [of interest].").

709 F.3d 343, 354 (4th Cir. 2013). The third factor, reviewing the adequacy of the materials considered and the degree to which they support the administrator's decision, is at issue in this case. Such evidence, specifically the typographical errors in Dr. Klang's medical notes, are extrinsic evidence for the court to consider in determining whether defendant abused its direction in determining Fredrick Smith was not "totally disabled" under the Disability Policy, and as a result, under the Life Policies.

Given the obvious errors in Dr. Klang's report and extrinsic evidence supplementing the report's accuracy, Dr. Weston relied upon inaccurate information when making his recommendation of Fredrick Smith's ability to perform a full-time sedentary job. Accordingly, it is of great significance to the court that Dr. Weston was the only physician to reach the conclusion that Fredrick Smith could perform gainful employment for full-time sedentary work. In contrast, Fredrick Smith's three treating physicians, Dr. Klang, Dr. Husain, Dr. M.A. Hannan

10

("Dr. Hannan"), all found that he was unable to perform any gainful occupation, including sedentary work. (Admin. Rec. (DE # 30-16) at 12, 14-15.)

2. Fredrick Smith's Medical Records

The defendant also made its determinations based upon its own independent reading and interpretation of Fredrick Smith's medical records. Defendant's first determination that Fredrick Smith did not meet the definition of totally disabled under the Disability Policy was as of 16 June 2016. In its first denial, defendant relied on portions of Fredrick Smith's medical history from 2013 to 2015, including: a surgery on 6 March 2013; two doctor's visit in 2013; four doctor's visits in 2014; a questionnaire filed out by Fredrick Smith from 2015; two hospitalization records from 2015; and three doctor's visits in 2016, on 12 January, 22 January, and 9 February. (Admin. Rec. (DE # 30-10) at 17-19.) The three most recent appointment details follow.

On 12 January 2016, Dr. Hannan, one of Fredrick Smith's treating physicians, indicated that Fredrick Smith was doing well with no flank or back pain. (Admin. Rec. (DE # 30-13) at 46.) This was reported in his medical notes for a follow up appointment regarding one of Fredrick Smith's kidney stones. (Id.) The 22 January 2016 doctor visit is the one with Dr. Klang, documented above, which notes that Fredrick Smith could walk "7 a half miles." (Admin. Rec. (DE # 30-12) at 21.) On 9 February 2016, Dr. Klang wrote in his medical notes that Fredrick Smith reported hunting once a week. (Id. at 35.)

On 1 September 2016, when defendant denied Fredrick Smith's appeal, it also added to its reliance materials in support of denial. (Admin. Rec. (DE # 30-10) at 19.) In doing so, defendant relied upon on additional doctors visit notes from: 22 March 2016, 5 May 2016, 11

11

May 2016, and 23 June 2016, as well as Dr. Weston's above-discussed report. On 22 March 2016, Fredrick Smith underwent a 24-hour Holter Monitor test with normal results. (Admin. Rec. (DE # 30-14) at 5.) On 5 May 2016, he complained of decreased functional capacity; hunting less; more dyspnea; episodic discomfort; and left flank discomfort. (Id. at 18.) On 11 May 2016, he underwent a cardiac cauterization and stenting of native right coronary artery for a significant ostial lesion. (Admin. Rec. (DE # 30-10) at 20.) On 23 June 2016, Dr. Hannan documented that Fredrick Smith was "doing well, [n]o new complaints.[1] (Admin. Rec. (DE # 30-14) at 1.) The visit also documented 4/5 strength in his upper and lower extremities, no chest pain, shortness of breath, or palpitations, and better mood, in addition to signs of fatigue, dizziness, weight gain, and joint pain. (Id. at 3.)

Not mentioned in the 1 September 2016 denial are numerous doctors' appointments, medical test results, and medical provider notes in the Administrative Record detailing Fredrick Smith's prolonged cardiac stress from 2013 to present. Two recent examples include: Fredrick Smith's appointment on 3 June 2016 with Dr. Klang where he complained of dyspnea; discomfort; got dizzy and lost his balance; and stated he does not feel too much better, (see id. at 25), and his 21 June 2016 appointment with Dr. Klang, where he continued to complain of dyspnea and dizziness, (see id. at 32). Also absent from any of defendant's benefits determinations are the opinions of Dr. Klang, Dr. Hannan, and Dr. Husain. This included Dr. Hannan's medical statement on 24 September 2015,

---

[1] This is a phrase often used by Dr. Hannan that does not appear to relate to whether or not he deems Fredrick Smith to be able to go back to work, but rather is boilerplate language used in his appointments. (See Admin. Rec. (DE # 30-11) at 2 (22 December 2015 appointment with Dr. Hannan "doing well, No new complaints"; Admin. Rec. (DE # 30-11) at 5 (19 October 2015 appointment with Dr. Hannan "doing well, No new complaints"; Admin. Rec. (DE # 30-11) at 20 (11 June 2015 appointment with Dr. Hannan, "doing well. No new complaints.").) But see (Admin. Rec. (DE # 30-10) at 18 (Fredrick Smith was hospitalized twice in September 2015); Admin. Rec. (DE # 30-16) at 14 (Dr. Hannan noted Fredrick Smith is not suitable to return to work on 25 September 2015).)

12

> The above referenced patient has multiple medical conditions including coronary artery disease, cerebral vascular accident, left-sided weakness, hypertension, [and] uncontrolled diabetes mellitus with polyneuropathy. He underwent coronary artery bypass grafting in 2013. He underwent a cardiac cauterization and stent placement during this hospital visit. He report post discharge angina.
>
> His blood sugar is uncontrolled. He was readmitted to the hospital on [13 September 2015] for syncope and acute renal failure. The patient has had a stroke and has residual left-sided weakness. He also suffers from anxiety disorder.
>
> The patient is officially disabled. I believe the above factors limit his ability to work in gainful employment.

(Admin. Rec. (DE # 30-16) at 14.) This also included Dr. Husain statement on 13 July 2016,

> Fredrick Smith has been under my care since March 2013. He has several medical conditions that prohibit his ability or sustain any type of employment to include sedentary work. His extensive medical history includes unstable angina, CAD, diabetes, hyperlipidemia, and hypertension which have required hospitalizations.

(Id. at 34.) Dr. Husain made a similar statement on 25 September 2015. (Id. at 15.)

Reviewing the Administrative Record as a whole, defendant ignored a vast number of Fredrick Smith's records when performing its analysis. Further, the court cannot find an example where a court upheld an administrator's decision to deny benefits based upon an inaccurate independent physician report and its own opinion as a non-medical provider with a conflict of interest, while all treating physicians of the insured recommended a different course of action. Cf. Elliott, 190 F.3d at 606 (finding an administrator's decision based upon "a combination of [four virtually unanimous] medical opinion[s] . . . indicating that [the insured] was not 'totally disabled' under the terms of the Plan" reasonable); Spry v. Eaton Corp. Long Term Disability Plan, 326 F. App'x 674, 679-80 (4th Cir. 2009) (finding that it is not unreasonable *per se* for an administrator not to adopt the treating physician's opinions when presented with numerous other physician opinions with the opposite conclusion); Piepenhagen, 395 F. App'x at 955–56 (finding that when an administrator discontinued benefits after

13

disregarding some portion of a physician's opinion that was favorable to the employee's claim and "seizing upon" the adverse portion to the employee's claim unreasonable). This is particularly concerning because of the inaccuracy of the record as applied. See White, 308 F. App'x at 717 (finding an administrator's reliance on a flawed medical evaluation as evidenced by a party's affidavit in the case unreasonable); Donovan, 462 F.3d at 329 (finding that the plan administrator's disregard of new information, namely a doctor's affidavit correcting an earlier statement because it was based on incomplete information, in favor of the earlier statement, unreasonable).

Accordingly, the court finds that defendant abused its discretion when determining that Fredrick Smith did not meet the definition of totally disabled under the Disability Policy and under the Life Policies because defendant did not rely upon substantial evidence.[2] Rather, defendant relied upon an inaccurate medical report, demonstrated by the incoherent language in the report as well as Dr. Klang's supplemented statement, over the unanimous opinion of Fredrick Smith's treating physicians. It cannot be said that defendant's own medical determinations, given its conflict of interest and the overwhelming evidence to the contrary, was the result of a deliberate, principled reasoning process. Plaintiff's motion for summary judgment will be granted.

## IV. CONCLUSION

For the aforementioned reasons, defendant's motion for summary judgment is DENIED (DE # 25); and plaintiffs' motion for summary judgment is GRANTED (DE # 27). Defendant

---

[2] Defendant used its determination that Fredrick Smith did not meet the definition of "totally disabled" under the Disability Policy to apply to the Life Policies as well.

shall back pay plaintiffs' benefits, reinstating benefits as of the denial date, 16 June 2016, (including life insurance premium waivers).

This 2 October 2018.

_____
W. Earl Britt
Senior U.S. District Judge